**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| GEORGE NEELY and JOAN NEELY, Individually and On Behalf of All Others Similarly Situated,<br><br>         Plaintiffs,<br><br>   v.<br><br>INTRUSION INC., JACK BLOUNT, and B. FRANKLIN BYRD,<br><br>         Defendants. | Case No. 4:12-cv-0374<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiffs George Neely and Joan Neely ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Intrusion Inc. ("Intrusion" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Intrusion; and (c) review of other publicly available information concerning Intrusion.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired Intrusion securities between January 13, 2021 and April 13, 2021, inclusive (the "Class Period"). Plaintiffs pursue claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Intrusion develops, sells, and supports products that purport to protect entities from cyberattacks by combining advanced threat intelligence with real-time artificial intelligence. It offers three products: Shield, a cybersecurity solution packaged as a comprehensive, real-time AI-based Security-as-a-Service; TraceCop, a big data tool with IP intelligence, including reputation information on known good and known bad active IP addresses; and Savant, a network monitoring solution that identifies suspicious traffic in real-time.

3.      On April 14, 2021, White Diamond Research published a report alleging, among other things, that Intrusion's product, Shield, "has no patents, certifications, or insurance, which are all essential for selling cybersecurity products" and that "Shield is based on open-source data already available to the public." Thus, the report stated that "Shield is a repackaging of pre-existing

technology rather than an innovative offering."  Moreover, the report alleged that the claims that Shield "stopp[ed] a total of 77,539,801 cyberthreats from 805,110 uniquely malicious entities . . . in the 90-day beta program" were "outlandish," leading White Diamond to question "[h]ow have these companies been able to function so far, as they've been attacked many times per minute by ransomware, malware, data theft, phishing and DDoS attacks?"

4.     On this news, the Company's share price fell $4.50, or over 16%, to close at $23.75 per share on April 14, 2021, on unusually heavy trading volume.  The share price continued to decline by $3.22, or 14%, over the next trading session to close at $20.53 per share on April 15, 2021.

5.     Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that Intrusion's Shield product was merely a repackaging of existing technology in the Company's portfolio; (2) that Shield lacked the patents, certifications, and insurance critical to the sale of cybersecurity products; (3) that the Company had overstated the efficacy of Shield's purported ability to protect against cyberattacks; (4) that, as a result of the foregoing, Intrusion's Shield was reasonably unlikely to generate significant revenue; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

6.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

9.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  In addition, the Company's principal executive offices are in this District.

10.      In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

11.      Plaintiffs George Neely and Joan Neely, as set forth in the accompanying certification, incorporated by reference herein, purchased Intrusion securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

12.      Defendant Intrusion is incorporated under the laws of Delaware with its principal executive offices located in 101 East Park Blvd., Suite 1300, Plano, Texas 75074.  Intrusion's common stock trades on the NASDAQ exchange under the symbol "INTZ."

13.     Defendant Jack B. Blount ("Blount") was the Company's Chief Executive Officer ("CEO") at all relevant times.

14.     Defendant B. Franklin Byrd ("Byrd") was the Company's Chief Financial Officer ("CFO") at all relevant times.

15.     Defendants Blount and Byrd (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

16.     Intrusion develops, sells, and supports products that purport to protect entities from cyberattacks by combining advanced threat intelligence with real-time artificial intelligence.  It offers three products: Shield, a cybersecurity solution packaged as a comprehensive, real-time AI-based Security-as-a-Service; TraceCop, a big data tool with IP intelligence, including reputation information on known good and known bad active IP addresses; and Savant, a network monitoring solution that identifies suspicious traffic in real-time.

**Materially False and Misleading**
**Statements Issued During the Class Period**

17.     The Class Period begins on January 13, 2021.  On that day, the Company issued a

press release entitled "INTRUSION Successfully Completes Beta Testing of its Newest

Cybersecurity Solution, Shield; Announces General Availability."  It stated, in relevant part:

> ***Beta testing of INTRUSION Shield confirmed the solution's efficacy by stopping
> a total of 77,539,801 cyberthreats from 805,110 uniquely malicious entities
> attempting to breach 13 companies that participated in the 90-day beta program.***
> Shield was able to continuously protect these companies from ransomware, denial
> of service attacks, malware, data theft, phishing and more. In fact, analysis by
> INTRUSION also concluded that Shield would have defended against the
> Sunburst malware that was at the heart of the recent cyberattacks involving
> SolarWinds and FireEye, which impacted many government agencies and 18,000
> SolarWinds customers.
>
> "With the high-risk patterns we've incorporated into the rule set that feeds our AI,
> along with the reputation and suspicious activity that it searches for while
> monitoring all traffic in and out of a network, we can confidently say Shield
> would have protected our customers where clearly other security approaches
> failed," said Jack B. Blount, President and CEO of INTRUSION. "The malware
> had been living on the SolarWinds network for at least nine months undetected –
> it got past firewalls and many other cybersecurity products. This is all the more
> reason companies need a multi-layered approach to cybersecurity, and specifically
> one that stops threats in real-time to protect them from the damage cybercriminals
> can cause over time."
>
> ***All companies participating in the beta program have made the decision to
> move forward with Shield in production.***
>
> "The Shield solution has shown us that virtually every network is already
> infected, and front-end protection is not possible. The understanding that
> networks are already compromised and that the only means of protection is to
> monitor and restrict outgoing traffic is the breakthrough of the Shield
> philosophy," said Richard, President of NovaTech.
>
> Additionally, false positive security alerts – where legitimate traffic is identified as
> a threat – are a significant problem among cybersecurity solutions available today,
> with Ponemon Institute reporting that most cybersecurity companies see mistaken
> alerts happening 33% of the time. Cybersecurity professionals spend hundreds of
> hours investigating these alerts only to determine ultimately that there was no
> threat. ***Beta testing for Shield showed a median false positive rate of 0.001% of
> all traffic, far surpassing other solutions on the market and allowing businesses***

*to run uninterrupted.* Multiple beta customers were happy to report they saw zero false positives using Shield.

18.     On February 25, 2021, Intrusion announced its fourth quarter and full year financial results in a press release that stated, in relevant part:

> "Since releasing INTRUSION's revolutionary Shield solution only 6 weeks ago, we have received an unprecedented amount of interest and a growing pipeline of customers that is nothing short of extraordinary," said Jack B. Blount, President and CEO of INTRUSION. "Shield is the first platform that uses real-time artificial intelligence to not just block intruders, but to kill cyberattacks including zero-days. . . ."
>
> *       *       *
>
> **Fourth Quarter Financial Results**
>
> Revenue for the fourth quarter 2020 was $1.6 million, compared to $2.6 million in the fourth quarter 2019 and $1.6 million for the third quarter 2020. For the full year 2020, revenue was $6.6 million as compared to $13.6 million in 2019.
>
> Gross profit margin was 58% of revenue in the fourth quarter of 2020, compared to 61% in the fourth quarter 2019 and 59% in the third quarter 2020. For the full year 2020, gross margin was 59% as compared to 61% in the prior year.
>
> Operating expenses in the fourth quarter of 2020 were $4.8 million, which included a $1.1 million non-cash write-off related to a prior office lease agreement. This compares to operating expenses of $1.3 million in the fourth quarter 2019 and $2.3 million in the third quarter 2020. Full year 2020 operating expenses were $10.4 million, which included the aforementioned non-cash write-off, compared to $3.8 million in 2019.
>
> Net loss in the fourth quarter of 2020 was $3.9 million, which included the $1.1 million non-cash write-off and compares to net income of $0.3 million in the fourth quarter 2019 and a net loss of $1.4 million in the third quarter 2020. For the full year 2020, net loss was $6.5 million, which included the fourth quarter non-cash write-off, compared to net income of $4.5 million in the prior year.

19.     On March 9, 2021, Intrusion filed its annual report on Form 10-K for the period ended December 31, 2020 (the "2020 10-K") with the SEC, affirming the previously reported financial results.  Regarding Shield's performance, the Company stated, in relevant part:

> ***We could experience damage to our reputation in the cybersecurity industry in the event that our Shield solution fails to meet our customers' needs or to***

***achieve market acceptance.***  Our reputation in the industry as a provider of entity identification, data mining, and advanced persistent threat detection solutions may be harmed, perhaps significantly, in the event that Shield fails to perform as we expect it to. If Shield does not perform as we expect, if we experience delivery delays, or if our customers do not perceive the benefits of purchasing and using Shield as part of their comprehensive cybersecurity solution, our position as a leader in this technology space may be damaged and could affect the willingness of our customers, as well as potential customers, to purchase our other solutions that function separately from Shield. Any reputational damage could result in a decrease in orders for all of our solutions, the loss of current customers, and a decrease in our overall revenues which could in turn have a material adverse effect on our results of operation.

20.    On April 13, 2021, the Company issued a press release entitled "Intrusion Q1 2021

Results Surpass Expectations."  Therein, Intrusion stated, in relevant part:

Highlights from the quarter include:

- INTRUSION Shield is now protecting over 50,000 seats (almost 8x the company's original Q1 goal)

- Hired new Chief Sales Officer, Darryl Athans, to drive continued growth

- Signed over 30 channel partners including resellers in Australia and Mexico

- Company now able to sell latest innovation, Shield, globally

Since announcing the general availability of Shield in January 2021, the company wasted no time ramping up its go-to-market activities to finish the first quarter with several key wins. INTRUSION recently announced manufacturing giants Kimberly-Clark and Lippert Components signing on as Shield customers, with other customer additions including KBI and Geocent adopting Shield to protect their networks.

21.    The above statements identified in ¶¶ 17-20 were materially false and/or

misleading, and failed to disclose material adverse facts about the Company's business, operations,

and prospects.  Specifically, Defendants failed to disclose to investors: (1) that Intrusion's Shield

product was merely a repackaging of existing technology in the Company's portfolio; (2) that

Shield lacked the patents, certifications, and insurance critical to the sale of cybersecurity products;

(3) that the Company had overstated the efficacy of Shield's purported ability to protect against

cyberattacks; (4) that, as a result of the foregoing, Intrusion's Shield was reasonably unlikely to generate significant revenue; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

### Disclosures at the End of the Class Period

22.     On April 14, 2021, White Diamond Research published a report alleging, among other things, that Intrusion's product, Shield, "has no patents, certifications, or insurance, which are all essential for selling cybersecurity products" and that "Shield is based on open-source data already available to the public."  Thus, the report stated that "Shield is a repackaging of pre-existing technology rather than an innovative offering."  Specifically, it stated:

> Despite heavy promotion and a supposedly successful beta test, we do not believe Shield represents a novel offering from INTZ. In fact, we believe the company itself has said this. During INTZ's Q420 Earnings Call, and in a buzz-word flurry (AI, cyber-, supercomputer, etc.), Blount revealed that Shield is simply a mashup of INTZ's existing products. In Blount's words:
>
>> Shield is really all 3 of Intrusion's technologies married together in a single product solution.
>
> While this may initially sound exciting, it hardly represents any ground-breaking innovation.
>
> Here are a few other statements that Blount made in the Q420 Earnings Call suggesting Shield is a repackaging of pre-existing technology rather than an innovative offering:
>
> - "The TraceCop database that we have created, managed, grown, used for 25 years, is the core of what makes Shield work today."
>
> - "The Savant technology that we've had and improved for 12 years, again, is a core piece of the technology of Shield. How we open, inspect every packet of data is with the Savant technology. The only new thing that there is in Shield is the artificial intelligence that learns from the database, that can interpret what it finds when it opens a packet of data, and how it can decide if it's good or bad, when humans could look at that packet of data and have not a clue whether it was normal traffic or not normal traffic."

- "You have to think about Shield as the combination of 25 years of R&D, 25 years of product and development, 25 years of expertise around cybercrime, combined into a single product."

*        *        *

We believe the timeline of the announcement coupled with the lack of direct R&D investment into Shield preceding Blount's appointment as CEO casts doubt on Shield as the culmination of a quarter-century master plan.

- Though INTZ's R&D accounts for ~39% of the company's expenses (aside from a small peak in 2015/2016), R&D has remained reasonably proportional to its total operating expenses.

- According to its accounting policies, INTZ expenses R&D as it is incurred, thus the recent uptick in R&D expense in 2020 would not be related to Shield (if it truly is a product launching on the back of years worth of R&D).

- Recent financial statements provide no indication that INTZ has been ramping up to commercialize a cutting-edge cybersecurity product.

23.     Moreover, the report alleged that Intrusion's claims that Shield "stopp[ed] a total of 77,539,801 cyberthreats from 805,110 uniquely malicious entities . . . in the 90-day beta program" were "outlandish," leading White Diamond to question "[h]ow have these companies been able to function so far, as they've been attacked many times per minute by ransomware, malware, data theft, phishing and DDoS attacks?"  Specifically, the report stated:

**The Companies Featured From the Shield Beta Test Are Small And Have Existing Relationships with Intrusion**

In INTZ's Needham Virtual Growth Conference presentation on 1/13/21, a slide shows the testimonials of three companies that were part of the Shield beta test. This slide is shown below:




*     *     *

All three customers have existing relationships with INTZ.

- B. Riley Financial is INTZ's investment banker who organized the equity raise in October 2020 and then issued a glowing initiation report on the stock.

- Bard Associates is a shareholder of INTZ.

- We interviewed the IT Manager for NovaTech, and he said the only reason why they got involved in the beta testing is because an IT securities guy works for both NovaTech and INTZ. We provide more details on this interview later in this section.

In the PR, INTZ made a lot of bold claims for a product with no real traction in the market. It states:

"Beta testing of INTRUSION Shield confirmed the solution's efficacy by stopping a total of 77,539,801 cyberthreats from 805,110 uniquely malicious entities attempting to breach 13 companies that participated in the 90-day beta program. Shield was able to continuously protect these companies from ransomware, denial of service attacks, malware, data theft, phishing and more."

These numbers don't seem real, but something out of a science fiction movie. This means that on average, over the 13 companies, each company was attacked 6M times over the 90-day trial period / 66k times per day / 2.7k per hour / 46 times per minute.

[table omitted]

How have these companies been able to function so far, as they've been attacked many times per minute by ransomware, malware, data theft, phishing and DDoS attacks?

The company also claims that Shield is so good, it could have prevented the recent Sunburst malware attack. The PR states:

"In fact, analysis by INTRUSION also concluded that Shield would have defended against the Sunburst malware that was at the heart of the recent cyberattacks involving SolarWinds and FireEye, which impacted many government agencies and 18,000 SolarWinds customers."

SolarWinds (SWI) is a $5B+ IT infrastructure management software company. It sells security and data protection products. It spent $32M in Research & Development (R&D) and $82M in Sales and Marketing (S&M) in Q420, and a whopping $126M for the entire year 2020. We don't believe that INTZ has

developed a more sophisticated malware defending software than SWI, given what each company has accomplished and that INTZ has invested so little in R&D.

24.    White Diamond also expressed doubt that Intrusion's recent purported sales agreements would lead to significant revenue. The report stated:

On 3/31/21, INTZ announced that it signed a "new agreement" with leading global consumer products company Kimberly-Clark (KMB). One of the reasons why investors should be skeptical of this "agreement" is that the announcement doesn't include any financial details or terms on duration. We are not convinced that the contract is revenue generating and believe the "generalizations" in the announcements could imply a pilot program.

We don't believe a company the size of KMB would agree to migrate its network to a cybersecurity software that doesn't have any 3rd party certifications, without first testing it on a trial basis.

On 4/6/21, INTZ announced a new Shield customer, Lippert Components from LCI Industries (LCII). We don't think this sale is a big deal because Lippert was a former customer using INTZ's Savant service. This is also another associated party sale. James Gero is on the Board of Directors of both Lippert and INTZ. As shown in the screen shots below:

[images omitted]

Notice the Lippert executive, Jamie A. Schnur, president of the aftermarket, used the buzzword "AI" when describing why it is a Shield customer. However, Schnur isn't the IT guy in charge of cybersecurity.

We spoke with the investor relations rep of LCII. He said that the CFO told him that there's a wide range of programs they use for cybersecurity. From emails, to cell phones, to any of their machinery that's hooked up to the internet. And they report to their audit committee about their cybersecurity measures.

25.    On this news, the Company's share price fell $4.50, or over 16%, to close at $23.75 per share on April 14, 2021, on unusually heavy trading volume. The share price continued to decline by $3.22, or 14%, over the next trading session to close at $20.53 per share on April 15, 2021.

## CLASS ACTION ALLEGATIONS

26.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that

purchased or otherwise acquired Intrusion securities between January 13, 2021 and April 13, 2021, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

27.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Intrusion's shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class.  Millions of Intrusion shares were traded publicly during the Class Period on the NASDAQ.  Record owners and other members of the Class may be identified from records maintained by Intrusion or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

28.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

29.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

30.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)      whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)      whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Intrusion; and

(c)      to what extent the members of the Class have sustained damages and the proper measure of damages.

31.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

32.      The market for Intrusion's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Intrusion's securities traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired Intrusion's securities relying upon the integrity of the market price of the Company's securities and market information relating to Intrusion, and have been damaged thereby.

33.      During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Intrusion's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially

false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Intrusion's business, operations, and prospects as alleged herein.

34.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Intrusion's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

35.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

36.    During the Class Period, Plaintiffs and the Class purchased Intrusion's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

37.    As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were

materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Intrusion, their control over, and/or receipt and/or modification of Intrusion's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Intrusion, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

38.     The market for Intrusion's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Intrusion's securities traded at artificially inflated prices during the Class Period.  On April 13, 2021, the Company's share price closed at a Class Period high of $28.25 per share.  Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Intrusion's securities and market information relating to Intrusion, and have been damaged thereby.

39.     During the Class Period, the artificial inflation of Intrusion's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Intrusion's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Intrusion and its business, operations, and prospects, thus causing the price of the Company's securities to be

artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

40.     At all relevant times, the market for Intrusion's securities was an efficient market for the following reasons, among others:

(a)     Intrusion shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, Intrusion filed periodic public reports with the SEC and/or the NASDAQ;

(c)     Intrusion regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Intrusion was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

41.     As a result of the foregoing, the market for Intrusion's securities promptly digested current information regarding Intrusion from all publicly available sources and reflected such information in Intrusion's share price.  Under these circumstances, all purchasers of Intrusion's securities during the Class Period suffered similar injury through their purchase of Intrusion's securities at artificially inflated prices and a presumption of reliance applies.

42.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

43.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Intrusion who knew that the statement was false when made.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants

44.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

45.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Intrusion's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

46.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Intrusion's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

47.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Intrusion's financial well-being and prospects, as specified herein.

48.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct

as alleged herein in an effort to assure investors of Intrusion's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Intrusion and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

49.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

50.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and

for the purpose and effect of concealing Intrusion's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

51.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Intrusion's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Intrusion's securities during the Class Period at artificially high prices and were damaged thereby.

52.     At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Intrusion was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Intrusion securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

53.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

54.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

55.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

56.     Individual Defendants acted as controlling persons of Intrusion within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

57.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the

particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

58.    As set forth above, Intrusion and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon; Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(c)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated:  May 14, 2021                              Respectfully submitted,

                                                  */s/ Willie Briscoe*
                                                  Willie C. Briscoe
                                                  State Bar Number 24001788
                                                  **THE BRISCOE LAW FIRM, PLLC**
                                                  12700 Park Central Drive, Suite 520
                                                  Dallas, TX  75251
                                                  Telephone: 972-521-6868
                                                  Facsimile: 346-214-7463
                                                  wbriscoe@thebriscoelawfirm.com

                                                  **POMERANTZ LLP**
                                                  Jeremy A. Lieberman
                                                  (*pro hac vice* application forthcoming)
                                                  J. Alexander Hood II
                                                  (*pro hac vice* application forthcoming)
                                                  Thomas H. Przybylowski
                                                  (*pro hac vice* application forthcoming)
                                                  600 Third Avenue, 20th Floor
                                                  New York, New York 10016
                                                  Telephone: (212) 661-1100
                                                  Facsimile: (212) 661-8665
                                                  jalieberman@pomlaw.com
                                                  ahood@pomlaw.com
                                                  tprzybylowski@pomlaw.com

                                                  **BRONSTEIN, GEWIRTZ
                                                  & GROSSMAN, LLC**
                                                  Peretz Bronstein
                                                  (*pro hac vice* application forthcoming)
                                                  60 East 42nd Street, Suite 4600
                                                  New York, NY 10165
                                                  Telephone: (212) 697-6484
                                                  peretz@bgandg.com

                                                  ***Attorneys for Plaintiffs***